**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| Janice C. Burrell, | ) | |
| | ) | |
|     **Plaintiff,** | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:09-325-KD-B** |
| | ) | |
| Infirmary West, | ) | |
| | ) | |
|     **Defendant.** | ) | |

## ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment and brief in support (Docs. 81, 82, 83), Plaintiff's Response and supporting documentation (Docs. 86, 87, 88, 89), Defendant's Response to Plaintiff's Response (Doc. 90), and Plaintiff's Reply thereto (Doc. 94); along with Defendant's Motion to Strike (Doc. 91) and Plaintiff's Response in Opposition and supporting documentation (Doc. 92, 93, 97).  For the reasons set forth herein, the Court finds that Defendant's motion for summary judgment is due to be **GRANTED** and that Defendant's Motion to Strike is due to be **GRANTED**.

## I.    Background

Plaintiff Janice C. Burrell ("Plaintiff") initiated this action on June 6, 2009.  Liberally construing her *pro se* amended complaint, the court finds that she asserts claims for racially discriminatory treatment in her workplace discipline and termination pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; retaliation for taking leave under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*; denial of her rights under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29

U.S.C. §§ 1161-69; and breach of contract, against Defendant Infirmary West. (Doc. 18).

Defendant has moved for summary judgment as to all claims. (Doc. 81).

Plaintiff has offered the affidavit of another registered nurse, Teresa Lanier, as expert opinion. (Doc. 88, 93). Defendant has moved to strike this affidavit. (Doc. 91).

## II.      Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (Dec. 2010). The recently amended Rule 56(c) governs procedures and provides as follows:

> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c) (Dec. 2010).

Defendant, as the party seeking summary judgment, bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in her favor. Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted). The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Secretary of Dep't of Children & Family Serv., 358 F.3d 804, 809 (11th Cir. 2004), cert. den., 534 U.S. 1081 (2005).

## III.   Facts[1]

Plaintiff, an African-American, became an employee at will with Infirmary West on August 14, 2006. (Doc. 18 at 1-2; Doc. 83-2 at 1, 6; Doc. 87 at 2). Employed as a registered

---

[1] The Court has made its determination of facts by "review[ing] the record, and all its inferences, in the light most favorable to [Plaintiff,] the nonmoving party." Benson v. Tocco, Inc., 113 F.3d 1203, 1207 (11th Cir. 1997).

nurse (RN), she worked in the Long-Term Acute Care (LTAC) Unit of the hospital.  (Doc. 83-2 at 1; Doc. 83-1 at 1-2).  Plaintiff was initially assigned to the section of LTAC known as the Long-Term Ventilation Tracheostomy (LTVT) Unit, on the 4th Floor West, which involved providing very acute care to patients on ventilators.  (Doc. 83-1 at 1-2; Doc. 83-2 at 1).  On January 1, 2007, Gary Bartlett, another LTAC Unit employee, became Nurse Manager of the LTAC Unit and thus Plaintiff's supervisor, a position which he held through Plaintiff's termination from Infirmary West.  (Doc. 83-1 at 1).

On several occasions, Plaintiff would confuse her work schedule, failing to appear for scheduled shifts and not calling to explain her absence.  Bartlett counseled Plaintiff about these attendance issues.  On July 17, 2007, Plaintiff again failed to appear for work or call for a third time.  Plaintiff was called and told to report to work, which she did.  Bartlett issued a formal written disciplinary notice to Plaintiff, who again claimed that she was unaware her schedule had been changed.  (Id. at 2, 8; Doc. 83-2 at 1-2).

In January 2008, one of the primary admitting physicians on the LTVT Unit expressed his concern to Bartlett about Plaintiff's competence to care for the patients on that unit.  He was particularly concerned with reports by other nurses that Plaintiff would leave medication in patients' rooms without administering it.  Other nurses had also reported such incidents to Bartlett, claiming that Plaintiff did not follow procedures and left medication with patients without administering it or completing required documentation.  (Doc. 83-1 at 2, 9).  One of Plaintiff's co-workers submitted a written complaint to Mr. Bartlett expressing concern that Plaintiff was not adequately attending to Plaintiff's patients' needs and did not take suggestions offered by other nurses.  (Id. at 10).  On one occasion, Bartlett observed Plaintiff turning a knob

on a patient's ventilator in response to an alarm.  (Id. at 2, 9).  Bartlett explained to Plaintiff that only respiratory therapists could change ventilator settings.  (Doc. 87 at 2).

On January 21, 2008, Bartlett and Latoya Black, the LTAC Unit Team Leader, conducted a formal counseling session with Plaintiff regarding these issues.  Due to these concerns and Bartlett's own observations, the decision was made to transfer Plaintiff to the Medical Surgery ("med-surg") Unit on the 5th Floor West area of the hospital, another section of the LTAC Unit which dealt with patients requiring less acute care than those in the LTVT Unit.  She was placed on a performance plan to review her performance on a weekly basis and was instructed to take additional training classes in patient care.  (Doc. 83-1 at 1-2, 9).

Plaintiff was transferred to the med-surg Unit on January 27, 2008.  (Id. at 3).  This transfer left only white employees on the LTVT Unit day shift.  (Doc. 87 at 2).  Immediately following her transfer, Plaintiff called in sick two days.  On February 1, she failed to show up for her scheduled shift or call.  Another disciplinary report was prepared for this absence, but Bartlett was unable to discipline Plaintiff at the time because, prior to her next scheduled shift, she submitted documents requesting a six-week FMLA leave to care for a family member, to commence on February 9.  The request for leave was granted.  (Id. at 3, 11; Doc. 83-2 at 2).

Bartlett informed Plaintiff that she had been scheduled by the hospital to take a class during the period she had requested for FMLA leave.  (Doc. 87 at 3; Doc. 94 at 7).  When Plaintiff showed up to attend the class, however, she was told that she was not registered to attend.  (Doc. 87 at 3).

A new RN was hired in the med-surg unit on January 24, 2008, before Plaintiff requested FMLA leave.  This position had been vacant and posted since October 2007.  No new RNs were hired in the med-surg unit while Plaintiff was on FMLA leave.  Another new RN was hired to

the LTVT Unit on February 7, 2008, also to fill a position that had been vacant and posted since October 2007.  (Doc. 83-2 at 4).

Plaintiff returned to work on March 24, 2008 to begin her duties in the med-surg unit.  At that time, she was disciplined for her absence on February 1.  Plaintiff again claimed confusion about her schedule.  (Doc. 83-1 at 3, 11).  During the disciplinary meeting, Plaintiff brought up vacation days in April that she had requested back in January.  (Id. at 3; Doc. 18 at 4).  In response, Bartlett repeatedly said "You just got back" and said the vacation days would not be approved unless she could find someone to work in her place.  (Doc. 18 at 4; Doc. 83-1 at 3; Doc. 87 at 9).  Melissa Wheat, Employee Relations Manager for Infirmary West, advised Plaintiff that the granting of vacation days was within her supervisor's discretion and that he had a right to deny her the time off if problems with staffing would arise from granting them.  (Doc. 83-2 at 2).  Plaintiff asked Wheat if she was being punished for taking FMLA leave, informing her that Bartlett had repeatedly said "You just got back."  (Doc. 87 at 9).  Wheat told her that Bartlett had had to work while she was on FMLA leave and that the situation might be helped if Plaintiff offered to work extra time.  (Id.).  Plaintiff was able to secure someone to fill in for her, and the vacation request was approved.  (Doc. 83-1 at 3; Doc. 83-2 at 2).

On March 26, 2008, between the hours of 4:00 p.m. and 7:00 p.m., a patient in room 556 who was assigned to Plaintiff wanted to leave the hospital against medical advice.  (Doc. 83-1 at 3, 48).  Hospital policy dictates that when a patient insists on leaving the hospital against medical advice, staff should assess the patient's rationale for wanting to leave and attempt to intervene to prevent the patient from leaving, such as having the attending physician speak with the patient.  (Id. at 12).  Bartlett claims that Plaintiff made no effort to intervene with the patient, stayed out

of the patient's room during the crisis, and left it to others to take care of the situation.  (Id. at 3, 48).

All unit nurses are required to wear computerized locator badges which electronically record the time and duration of their visits to patients' rooms.  (Id. at 3).  Bartlett claims that during the afternoon time period when the patient in room 556 was expressing a desire to leave, Ms. Burrell spent almost no time in the patient's room.  (Id. at 3, 13-21).  A reading of Bartlett Ex. F indicates that on the afternoon in question, Plaintiff was in room 556 for a period of 4 minutes and 25 seconds between 1:00 and 2:00 p.m., for 7 minutes and 44 seconds between 3:30 and 4:00 p.m., and 14.5 minutes between 4:25 and 4:50 p.m.  (Id. at 3, 13-17).  A chart at the end of Bartlett Ex. F indicates that on March 26, 2008, Plaintiff spent a total of over 7000 seconds (116 minutes and 40 seconds) in room 556 between the hours of 7:00 a.m. and approximately 9:00 p.m. (Id. at 21).  Plaintiff claims she followed procedure with the patient attempting to leave against medical advice, by explaining the consequences of leaving and by informing a doctor of the situation.  (Doc. 87 at 3).

On April 1, 2008, the family of the patient in Room 581 complained to Latoya Black, the LTAC Unit Team Leader, about the care being provided by Plaintiff and requested that another caregiver be assigned to the patient.  The family reported that Plaintiff had been made aware that the patient had soiled himself, yet she left the patient soiled for several hours and did not change him or send in a nursing assistant to do this before feeding him lunch.  The family also complained that Plaintiff left medication in the patient's room without administering it to him and that she had failed to administer ordered IV medication.  The family alleged that Plaintiff was unable to start the IV that morning and did not make any further attempts, causing the patient to go without necessary IV antibiotics for several hours until another nurse administered

them after a family member went to another unit and complained.  Black reported these complaints to Bartlett.  (Doc. 83-1 at 4, 22-23; Doc. 87 at 4-5, 9-10).

In reviewing the patient's chart in response to these complaints, Bartlett noticed that Plaintiff had not completed documentation required by hospital policy.  (Doc. 83-1 at 4, 27).  She had not documented the original infiltration and the removal of the IV in the morning, nor had she documented her failed attempts to restart the IV or any explanation for these failures.  (Id. at 4, 27, 30).  Plaintiff had also not documented whether all ordered medications had been administered.  (Id. at 4, 27, 31-38).  When interviewed by Bartlett, Plaintiff admitted her failure to administer the IV antibiotics and to document why the other medication was not administered pursuant to hospital policy.  (Id. at 5, 48).  The night nurse, who is white, also signed off on the patient's chart; this nurse has not been terminated from Infirmary West.  (Id. at 27; Doc. 87 at 6, 10; Doc. 94 at 4).

Bartlett reviewed the situation with the hospital's Human Resource Department, and the decision was made to discharge Plaintiff.  (Doc. 83-1 at 5; Doc. 83-2 at 3).  A termination meeting was held on April 4, 2008, during which Plaintiff again admitted her failure to administer the IV antibiotics on April 1, as well as her failure to document her attempts to insert the IV.  (Doc. 83-2 at 3).  Plaintiff was terminated effective that same day.  (Id. at 3, 13). Plaintiff indicates that the accusations leading to her termination began around the time she was believed to be next in line for promotion to charge nurse due to her seniority.  (Doc. 87 at 2).

Plaintiff claims that after she was terminated, Bartlett called Blue Cross/Blue Shield to terminate her employee health insurance.  (Doc. 18 at 5; Doc. 86 at 2-3; Doc. 87 at 5).  She also claims, without any supporting admissible evidence, that Bartlett called her pharmacy and stated that her employee insurance was canceled.  Plaintiff states that when she went to get a

prescription filled, the pharmacy did not fill it and told her that her insurance had been canceled the day she was terminated. (Doc. 86 at 2-3; Doc. 87 at 5). Bartlett denies contacting either Blue Cross or the pharmacy and asserts that he has no responsibility or authority to administer employee group health insurance. (Doc. 83-1 at 5).

It is the policy of Infirmary Health Systems, of which Infirmary West in an affiliate, that all group health insurance and COBRA issues be handled by the Infirmary Health System Employee Service Center at the Mobile Infirmary Medical Center campus. (Doc. 83-2 at 3). Employee coverage in group health insurance ends upon termination of employment. (Id. at 3, 14). A personnel action request (PAR) reflecting notice of Plaintiff's termination was sent to the Employee Service Center, which entered it on April 7, 2008. (Id. at 3).

Once a PAR reflecting termination is entered into the system, the computer automatically shuts off active insurance coverage relating to the employee's effective termination date. (Doc. 90-1 at 1). The Employee Service Center then determines the employee's eligibility for COBRA and sends a report to Blue Cross/Blue Shield to that effect. (Doc. 83-2 at 3). COBRA application papers are mailed to the employee address held in the computer system. (Doc. 90-1 at 1). This application would retroactively reinstate a terminated employee's health insurance to her date of termination. (Id. at 2; Doc. 83-2 at 3-4). Plaintiff was deemed eligible for COBRA coverage effective April 4, 2008, and a COBRA application package was mailed to her at 3100 North Angus Drive in Mobile. (Doc. 90-1 at 2-3; Doc. 83-2 at 3-4, 15). Plaintiff states that she did not receive this COBRA package. (Doc. 87 at 10). Any COBRA notifications returned by the post office as non-deliverable are noted by the Employee Service Center. (Doc. 90-1 at 2). The package mailed to Plaintiff was not returned by the post office. (Id.).

IV.     **Analysis**

A.      **Discriminatory Discipline & Termination Claims**

1.  **Applicable Law**

A plaintiff may prove a claim of intentional discrimination through direct evidence, circumstantial evidence, or through statistical proof.  See, e.g., Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1322-23 (11th Cir. 2006); Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990). Where a plaintiff relies on circumstantial evidence of discrimination, courts evaluate whether summary judgment is appropriate using the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981).  Under the McDonnell Douglas framework, a plaintiff must show an inference of discriminatory intent, and therefore carries an initial burden of establishing a *prima facie* case of discrimination.  411 U.S. at 802.  Presenting a *prima facie* case requires that the plaintiff establish facts adequate to permit an inference of discrimination.  Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).  The successful assertion of a *prima facie* case then "creates a rebuttable presumption that the employer unlawfully discriminated against" the plaintiff.  E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002).  If this occurs, and a *prima facie* case of discrimination is presented, the burden of producing evidence that the employer's action was taken for a legitimate, non-discriminatory reason then shifts to the employer.  Id.  See, e.g., Holifield, 115 F.3d at 1564.  A defendant must only identify a nondiscriminatory basis, not prove it.  Coutu v. Martin Cnty. Bd. of Cty. Comm'rs, 47 F.3d 1068, 1073 (11th Cir. 1995).  In the last step of the burden-shifting analysis, if the employer meets "its burden of production, the presumption of discrimination is rebutted, and the inquiry 'proceeds to a new level of specificity,' in which the plaintiff must

show that the proffered reason really is a pretext for unlawful discrimination." Joe's Stone

Crabs, 296 F.3d at 1272-1273. See also Combs v. Plantation Patterns, 106 F.3d 1519, 1538

(11th Cir. 1997). On establishing pretext, the Eleventh Circuit has held that

> [a] plaintiff can satisfy her burden of showing pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256, 101 S. Ct. 1089. There must be sufficient evidence to allow a reasonable fact-finder to conclude that the employer's articulated reasons are not believable. Jackson v. State of Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005). This can be accomplished by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered explanation. Id. The plaintiff must present significant and probative evidence of pretext in order to avoid summary judgment. Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996).

> This court has explained that if the proffered reason was legitimate and nondiscriminatory, then the plaintiff must "'meet [the proffered] reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.'" Brooks v. County Comm'n of Jefferson County, Ala., 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000)). This court has further explained that "[a] reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.' " Id. (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (emphasis in original)).

Davis-Dietz v. Sears, Roebuck and Co., 284 Fed. Appx. 626, 630 (11th Cir. 2008).

To establish the elements of a *prima facie* race discrimination case under McDonell

Douglas, the plaintiff must show that: 1) she is a member of a protected class; 2) she suffered an

adverse employment action; 3) the employer replaced her with a person of another group or

treated her less favorably than a similarly situated individual of another group; and 4) she was

qualified for the position. See, e.g., Burke-Fowler, 447 F.3d at 1323; Wilson v. Bailey, 934 F.2d

301, 304 (11th Cir. 1991). When a plaintiff alleges discriminatory discipline, to determine

whether employees are similarly situated, courts evaluate whether the employees are involved in

or accused of, at the least, the same or similar conduct, and yet are disciplined in different ways.

Burke-Fowler, 447 F.3d at 1323; Anderson v. WBMG-42, 253 F.3d 561, 564 (11th Cir. 2001);

Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999) (holding that the conduct should be "nearly identical").[2]  As noted in Moore v. Alabama Dep't of Corrections, 137 Fed. Appx. 235, 238 (11th Cir. 2005):

> . . . . the plaintiff must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct.

To compare her treatment to that of other employees, a plaintiff must show that her comparators are similar "in all relevant respects."  Holifield, 115 F.3d at 1564.  See, e.g., Silvera v. Orange County School Bd., 244 F.3d 1253, 1259 (11th Cir. 2001); Evans v. Alabama Dep't of Corrections, 418 F. Supp. 2d 1271, 1278 (M.D. Ala. 2005).  Indeed, "[w]e require that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."  Maniccia, 171 F.3d at 1368.  See also Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1280 (11th Cir. 2008); Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984).  The most important variables in a discriminatory discipline case are the nature of the offenses committed and the nature of the punishments imposed, and a plaintiff must show that "the disciplinary measures enforced against her were more severe than those enforced against the other person who engaged in similar misconduct."  Jones v. Gerwen, 874 F.2d 1534, 1540 (11th Cir. 1989).  In sum, in determining whether employees are similarly situated for purposes of establishing a *prima facie* case, a plaintiff cannot assemble a comparator out of vague and

---

[2]  The Eleventh Circuit held in Cuevas v. American Exp. Travel Related Services Co., Inc., 256 Fed. Appx. 241, 243 (11th Cir. 2007) that "[a]lthough the 'nearly identical' misconduct requirement was called into question by Alexander v. Fulton County, Ga., 207 F.3d 1303, 1334 (11th Cir.2000), we are 'bound to follow Maniccia's "nearly identical" standard rather than the standard articulated in Alexander because when a later panel decision contradicts an earlier one, the earlier panel decision controls.'"

conclusory allegations; rather, it is necessary to consider whether the employees were involved in, or accused of, the same or similar conduct yet were disciplined in different ways.  Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1311 (11th Cir.), modified, 151 F.3d 1321 (11th Cir. 1998); Evans, 418 F. Supp. 2d at 1278.

### 2.  Application

Plaintiff claims that Infirmary West discriminated against her both by disciplining her for not reporting to work or calling to advise of her absence and by terminating her.  (Doc. 18 at 1-5).  Infirmary West does not dispute that Plaintiff can satisfy three of the four elements required to make a *prima facie* showing of race discrimination for each instance:  that she belongs to a protected class, that she suffered an adverse employment action, and that she was qualified for her job.  (Doc. 82 at 10).  The only element it challenges is whether Plaintiff has identified similarly-situated employees outside of her protected class whom Infirmary West treated more favorably.  (Id.).  The Court finds that summary judgment is due to be **GRANTED** in favor of Infirmary West because, even assuming Plaintiff's allegations are true for purposes of this motion, the fact remains that Plaintiff cannot identify another Infirmary West employee who engaged in the same or similar conduct but who was disciplined differently (i.e., a valid comparator). Accordingly, Plaintiff cannot establish a *prima facie* case of discrimination in either disciplinary action by Infirmary West.

### a.  Discipline for Missing Shifts

To establish a *prima facie* case of discrimination in being disciplined for missing scheduled shifts without calling, Plaintiff compares herself to two other white nurses at the hospital.  One of them, an RN named Katherine Smith, was regularly tardy to work but never written up.  (Doc. 18 at 2; Doc. 86 at 3; Doc. 88 at 13).   The other, unnamed nurse would stay

in the nurse manager's office for hours at a time without informing anyone of her whereabouts, forcing other nurses to cover her duties. (Doc. 18 at 5).

Neither of these comparators is sufficient because neither engaged in misconduct nearly identical to that of the Plaintiff in quantity or quality. See Maniccia, 171 F.3d at 1368. Plaintiff has offered no evidence that the nurse who spent large amounts of time in the nurse manager's office was doing so improperly, nor has she shown that her supervisors knew the nurse was even engaging in this activity. Moreover, this behavior is not "nearly identical" to being absent without calling. As for Katherine Smith, though she may have shown up tardy to work on a regular basis, a tardy is also materially different from a no call/no show for an entire shift. As such, Plaintiff fails to establish a *prima facie* case of discrimination in being disciplined for her no call/no shows.

### b.  <u>Termination</u>

Plaintiff also presents several white nurses as comparators to show discrimination in her termination. Her primary comparator is Katherine Smith. (Doc. 83-1 at 5). In addition to being regularly tardy to work, Smith had also once left medication in a patient's room after becoming upset with the patient and his family members and arguing with them. (Doc. 83-1 at 5; Doc. 86 at 3; Doc. 87 at 5; Doc. 94 at 2-3). One of the patient's family members refused to let Smith continue caring for the patient. (Doc. 94 at 2). Several other patients had also complained of Smith's attitude and asked that she no longer be assigned to them. (Doc. 86 at 3; Doc. 87 at 2). Plaintiff would at times change patients with Smith because of these complaints. (Doc. 87 at 2). Plaintiff claims that another nurse, identified by her as "Shelly," also had a bad attitude and that the same family member who barred Smith from caring for his relative also refused to let Shelly care for that patient. (Doc. 94 at 2). Finally, Plaintiff points out that a white night nurse had also

signed off on the faulty patient chart from April 1, 2008, though this nurse was not fired by Infirmary West. (Doc. 83-1 at 27; Doc. 87 at 6, 10).

Again, none of these other Infirmary West employees can be considered a valid comparator for the purpose of demonstrating racial discrimination in Plaintiff's termination. Bartlett, Plaintiff's supervisor, states that the decision to terminate her "was totally based on her inadequate and dangerously deficient level of patient care." (Doc. 83-1 at 5). The evidence presented shows that Smith left unadministered medication in a patient's room against policy only once, after an argument with the patient's family, while multiple reports of Plaintiff engaging in the same conduct were made to Bartlett. Apart from this incident and Smith's tardies, the only evidence Plaintiff presents to question Smith's and Shelly's performance as nurses is general complaints of them having bad attitudes and being disliked by some patients.

On the other hand, the evidence shows several instances of alleged misconduct by Plaintiff. Bartlett witnessed Plaintiff manipulating a knob on a patient's ventilator without understanding its function and in knowing violation of hospital policy, as she admits she had been told that only respiratory therapists could change ventilator settings. (Doc. 83-1 at 2, 9; Doc. 87 at 2). Plaintiff was also alleged to have not intervened when a patient under her care demanded to leave the hospital against medical advice, even though hospital policy required that she attempt to calm the patient and take steps to persuade him to stay. (Doc. 83-1 at 3, 12, 48)

Another patient who had soiled himself was left that way for several hours because Plaintiff did not change him or make sure someone else had. This same patient also went without necessary IV antibiotics for several hours because Plaintiff, after her initial attempts to administer them failed, made no further attempts for the rest of the day. Another nurse finally administered them only after a member of the patient's family went to another unit to complain.

(Doc. 83-1 at 4, 22-23; Doc. 87 at 4-5, 9-10). In addition, a review of the patient's chart revealed that Plaintiff had failed to complete documentation as required. (Doc. 83-1 at 4, 27, 30-41; Doc. 87 at 6, 10; Doc. 94 at 4). Though a white night nurse also signed off on this faulty paperwork, Plaintiff presents no other evidence of misconduct by this nurse, and it is not clear from the evidence to what extent he can be faulted. (Doc. 83-1 at 27; Doc. 87 at 6, 10; Doc. 94 at 4). Based on the evidence presented, none of Plaintiff's comparators for her claim of discriminatory termination has engaged in misconduct that could be considered nearly identical in either quantity or quality to that committed by Plaintiff.

Even if Plaintiff could produce a valid comparator to establish a *prima facie* case of discrimination, Infirmary West has presented several legitimate, non-discriminatory reasons for terminating Plaintiff, to some of which Plaintiff herself admits and none of which Plaintiff has shown to be pretext. Plaintiff admits that she did not make any further attempt to start a patient's IV antibiotics after her initial attempts failed, nor did she document these attempts. (Doc. 86 at 4; Doc. 87 at 4-5). She blames these failures on not having the necessary supplies and on her busy schedule. (Doc. 86 at 4; Doc. 87 at 4-5). Plaintiff admits that she failed to document other procedures on this patient, again blaming her busy schedule, noting that another nurse also signed off on the faulty documentation, and devoting considerable energy to debating the wisdom of stated hospital policy, particularly in regards to when checking patients' IV feeding tubes is necessary. (Doc. 86 at 1-2, 4-5; Doc. 87 at 4; Doc. 93 at 2). She also admits to leaving this same patient in an unhygienic situation for several hours, though she attempts to shift blame to a nursing assistant who told her she would clean the patient. (Doc. 86 at 4; Doc. 87 at 5).

Plaintiff also admits manipulating a patient's ventilator despite having been told by her supervisor that hospital policy did not allow this, though she claims to have consulted a

respiratory therapist and simply applied his orders. (Doc. 87 at 2). Plaintiff acknowledges her multiple no-call/no-shows, though she attempts to blame them on changes being made to her schedule after she consulted it. (Id. at 2, 6). She also does not deny repeatedly leaving medication in patients' rooms, but instead attacks her supervisor for not showing her the medication she was alleged to have left behind. (Id. at 2). Finally, Plaintiff does deny neglecting her duties to counsel a patient attempting to leave the hospital against medical advice, claiming that she explained to the patient the consequences of doing so and that she informed a doctor of the patient's actions. (Id. at 3).

In sum, Plaintiff quarrels with the accuracy of Infirmary West's assessment of her abilities. However, whether Infirmary West's reasons for discharging Plaintiff were fair or accurate is not at issue in this case. See Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1266 (11th Cir. 2010). See also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 519 (1993) ("Once the defendant responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection, the factfinder must then decide not . . . whether that evidence is credible, but whether the rejection was discriminatory within the meaning of Title VII." (internal quotations omitted)). Title VII does not give plaintiffs the ability " 'simply to litigate whether they are, in fact, good employees.' " Alvarez, 610 F.3d at 1266 (quoting Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002)). Nor does Title VII turn courts into "super-personnel department[s] . . . to second-guess the wisdom of an employer's business decisions – indeed, the wisdom of them is irrelevant[.]" Id. (internal quotations omitted). This Court's only concern in analyzing discrimination claims is "whether unlawful discriminatory animus motivated the [employer's] decision." Id. (internal quotations omitted).

The evidence presented does not support a finding of any unlawful discriminatory animus, whether based on race or any other protected factor.  Plaintiff has not met her burden to " 'produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual.' "  Keaton v. Cobb County, Ga., No. 08-11220, 2009 WL 212097, at *3 (11th Cir. Jan. 30, 2009) (quoting Chapman v. AI Transport, 229 F.3d 1012, 1037 (11th Cir. 2000)).  In order to rebut Infirmary West's proffered nondiscriminatory reasons for termination as pretextual, Plaintiff  " 'must meet [each] reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of [each] reason.' "  Id. (quoting Chapman, 229 F.3d at 1030).

Though she questions the wisdom of hospital policy and attempts to blame others for her misconduct, Plaintiff has not produced sufficient evidence that Infirmary West's proffered reasons for termination were simply listed in order to disguise some discriminatory animus or are unworthy of credence.  Therefore, summary judgment is due to be **GRANTED** as to Plaintiff's Title VII claims of discrimination.

**C.**     **Retaliation for Exercising Rights under FMLA**

**1.  Applicable Law**

The FMLA grants an eligible employee the right to take up to 12 workweeks of unpaid leave annually "[i]n order to care for . . . [certain family members] . . . of the employee, if such . . . . [family member] . . . has a serious health condition."  29 U.S.C. § 2612(a)(1)(C).In order to be "eligible" for FMLA leave, the employee must be employed: "(i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (2) for at least 1,250 hours of service with such employer during the previous 12-month period."  29 U.S.C. § 2611(2)(A).  "The Act creates a private right of action to seek equitable relief and

money damages against employers who 'interfere with, restrain, or deny the exercise of or the attempt to exercise' FMLA rights." Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1293 (11th Cir. 2006).

Plaintiff claims that Infirmary West retaliated against her for taking FMLA leave by requiring that she find a replacement for her subsequent requested vacation time and by firing her from her position on return. The Court of Appeals for the Eleventh Circuit has explained that

> the FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, see 29 U.S.C. § 2615(a)(1), and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act, see 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220(c) ("An employer is prohibited from discriminating against employees ... who have used FMLA leave."). To state a claim of interference with a substantive right, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied. O'Connor v. PCA Family Health Plan, Inc., 200 F.3d 1349, 1353-54 (11th Cir. 2000); King v. Preferred Technical Group, 166 F.3d 887, 891 (7th Cir. 1999). In contrast, to succeed on a retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right. King, 166 F.3d at 891. In other words, a plaintiff bringing a retaliation claim faces the increased burden of showing that his employer's actions "were motivated by an impermissible retaliatory or discriminatory animus." Id.

Strickland v. Water Works and Sewer Bd. of City of Birmingham, 239 F.3d 1199,1206-07 (11th Cir. 2001).

Because there is no direct evidence of retaliation in this case, the Court must apply the same burden-shifting framework established in McDonnell Douglas Corp., 411 U.S. 792 (1973); see Strickland, 239 F.3d at 1207. Under this framework, Campbell bears the initial burden of establishing a *prima facie* case of discrimination, i.e., retaliation, by a preponderance of the evidence and if she does so, a presumption of discrimination arises. Christian v. Cartersville City Schools Bd. of Educ., 167 Fed. Appx. 89, 91 (11th Cir. 2006) (citing Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981)). "Demonstrating a *prima facie* case is not

onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." Holifield, 115 F.3d at 1562. In order to establish a *prima facie* case of retaliation, Campbell must show the following: (1) that she engaged in statutorily protected activity; (2) that she experienced an adverse employment action; and (3) that there is a causal connection between the protected activity and the adverse action. Hurlbert, 439 F.3d at 1297.

> Once the employee establishes a *prima facie* case of retaliation, the burden shifts to the employer "to articulate a legitimate reason for the adverse action." Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th Cir. 2006). If the employer does so, the employee must then show that the employer's proffered reason was pretextual by presenting evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Id. at 1298 (internal quotation marks omitted). The employee may rely on evidence that he already produced to establish his *prima facie* case. Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 921 (11th Cir. 1993).

Martin v. Brevard Cnty. Public Sch., 543 F.3d 1261, 1268 (11th Cir. 2008).

> A plaintiff can satisfy her burden of showing pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256, 101 S. Ct. 1089. There must be sufficient evidence to allow a reasonable fact-finder to conclude that the employer's articulated reasons are not believable. Jackson v. State of Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005). This can be accomplished by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered explanation. Id. The plaintiff must present significant and probative evidence of pretext in order to avoid summary judgment. Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996).
>
> This court has explained that if the proffered reason was legitimate and nondiscriminatory, then the plaintiff must "'meet [the proffered] reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.'" Brooks v. County Comm'n of Jefferson County, Ala., 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000)). This court has further explained that "[a] reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.' " Id. (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (emphasis in original)).

Davis-Dietz, 284 Fed. Appx. at 630.

## 2.    Application

For purposes of this summary judgment, it is assumed that Plaintiff can establish a *prima facie* case of retaliation.  Evidence has been presented which might allow a trier of fact to infer a causal connection between Plaintiff's FMLA leave and Bartlett's decision to recommend termination.[3]  Bartlett had informed Plaintiff that she was registered to take a class by the hospital.  (Doc. 87 at 3).  However, the class was scheduled to be held during Plaintiff's FMLA leave.  (Id.).  After Plaintiff requested FMLA leave, Bartlett canceled Plaintiff's registration in the class, apparently without Plaintiff's knowledge.  (Id.).  Also, when Plaintiff returned from FMLA leave, she brought up with Bartlett some vacation days she had requested prior to taking her leave.  (Doc. 18 at 4).  Plaintiff claims that Bartlett responded by repeatedly saying "You just got back" and refusing to let her take the vacation time unless she found someone to cover for her.  (Id.; Doc. 83-1 at 3; Doc. 87 at 9).  When Plaintiff  informed Melissa Wheat that Bartlett kept saying "You just got back" and asked her if she was being punished for taking FMLA leave, Wheat told her that Bartlett had had to perform nursing duties while Plaintiff was on leave and suggested that working some extra time might help the situation.  (Doc. 87 at 9).  Thus, some animus by Bartlett because of Plaintiff's FMLA leave could be inferred.  Moreover, because Bartlett was involved in the decision to terminate Plaintiff, a causal connection could be inferred. (Doc. 83-1 at 5, 49; Doc. 83-2 at 3, 11-12).

---

[3] Requiring Plaintiff to find her own replacement in order to take vacation does not rise to the level of an adverse employment action.  See Dixon v. Palm Beach Cnty. Parks & Recreation Dep't, 343 Fed. Appx. 500, 502-03 (11th Cir. 2009) (For purposes of establishing *prima facie* cases of religious discrimination, racial discrimination and retaliation, the employer's denial of the plaintiff's request for Sundays off was "not [an] adverse employment action because [it] did not result in a serious and material change in the terms, conditions, and privileges of [the plaintiff's] employment.").

However, Plaintiff fails in her retaliation claim because, as was established in the analysis of her racial discrimination claim, Infirmary West has proffered several legitimate, non-discriminatory reasons for terminating Plaintiff, and Plaintiff has not presented sufficient evidence to rebut them as pretextual.  In sum, Plaintiff has failed to produce evidence from which a reasonable factfinder could determine that Infirmary West's explanation for terminating her employment is unworthy of belief.  Therefore, summary judgment is due to be **GRANTED** as to Plaintiff's claim of retaliation.

**D.**     **Denial of COBRA Rights**

Plaintiff claims in her amended complaint that Infirmary West violated her right to keep her employee insurance plan under COBRA, asserting that Bartlett, her supervisor, canceled her insurance with Blue Cross/Blue Shield of Alabama after terminating her and that he personally called her pharmacy and reported that her insurance was canceled.  (Doc. 18 at 5; Doc. 86 at 2-3; Doc. 87 at 5).  Plaintiff claims she learned this from her pharmacy when she attempted to get a prescription filled and it was denied.  (Doc. 86 at 3).

Bartlett denies contacting anyone concerning Plaintiff's employee insurance and indeed asserts that he has no responsibility or authority in administering employee group health insurance.  (Doc. 83-1 at 5).  Plaintiff's only evidence of Bartlett's actions is inadmissible hearsay of what a pharmacy worker allegedly reported to her, and even this hearsay does not implicate  Bartlett.

The Court construes Plaintiff's claim as an assertion that Infirmary West improperly interfered with Plaintiff's participation in COBRA.  However, Plaintiff has not submitted any admissible evidence to support this allegation.  Infirmary West's practice of canceling an

employee's insurance upon termination does not violate COBRA, as the employee has the opportunity to reinstate her insurance retroactive to the date of her termination. (Doc. 90-1 at 2). Infirmary West has submitted evidence that they mailed Plaintiff the appropriate documents for continuation of her insurance under COBRA to Plaintiff's last known address. These documents were not returned in the mail as undelivered. (Doc. 90-1 at 1-3). Moreover, there is no indication in the record that Plaintiff elected to participate in COBRA by filing the requisite paperwork or paying the requisite premium.

In an affidavit filed by Plaintiff, after Infirmary West had filed its Motion for Summary Judgment, Plaintiff claims that she never received the standard COBRA application package from Infirmary West. (Doc. 87 at 10). Plaintiff's attempt to amend her complaint to assert a claim of failure to notify Plaintiff of her COBRA benefits is untimely. Moreover, such an effort would appear to be futile in light of the evidence of Infirmary West's good faith attempt to notify Plaintiff of her COBRA rights. See Roberts v. Nat'l Health Corp., 963 F. Supp. 512, 514-15 (D.S.C. 1997), aff'd, 133 F.3d 916 (4th Cir. 1998) (holding that an employee's protestation that he or she did not receive a COBRA notification letter is not enough to raise a genuine and material issue); Degruise v. Sprint Corp., 279 F.3d 333, 336 (5th Cir. 2002) ( The statute does not require proof of actual notice, so long as the administrator has sent the notice by means reasonably calculated to reach the recipient); Crotty v. Dakotacare Admin. Servs., 455 F.3d 828, 830 (8th Cir. 2006) (same).

For the aforementioned reasons, summary judgment is due to be **GRANTED** as to Plaintiff's claim for improper interference with COBRA benefits.

**E.**     <u>**Breach of Contract**</u>

Under Alabama law, "'[t]he elements of a breach-of-contract claim . . . are (1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages.'" <u>Hartford Cas. Ins. Co. v. Jenkins</u>, No. 09-0514-WS-M, 2010 WL 2348619, at *2 (S.D. Ala. June 09, 2010) (quoting <u>Shaffer v. Regions Fin. Corp.</u>, 29 So. 3d 872, 880 (Ala. 2009)). Plaintiff has failed to allege the terms of a valid contract or allege which provisions were breached by her termination. <u>See Davis v. Lake Wales Charter Sch.</u>, No. 8:06-cv-1382-T-30EAJ, 2006 WL 2864321, at *5 (M.D. Fla. Oct. 5, 2006).

In addition, undisputed evidence indicates that Plaintiff, like all Infirmary West employees, was an employee at will. (Doc. 83-2 at 1, 6). Under Alabama law, "[t]he general rule is that an employment contract at will may be terminated by either party with or without cause or justification. This means a good reason, a wrong reason, or no reason." <u>Hinrichs v. Tranquilaire Hosp.</u>, 352 So. 2d 1130, 1131 (Ala. 1977). <u>See also</u> <u>Bell v. S. Cent. Bell</u>, 564 So. 2d 46, 48 (Ala. 1990). It should be noted that Alabama law also states that "[t]he language contained in a[n employee] handbook can be sufficient to constitute an offer to create a binding unilateral contract" and that "an employment-at-will relationship can be modified by provisions in an employee handbook by which the employer promises not to discharge employees except by procedures or for causes set forth in the handbook." <u>Bell</u>, 564 So. 2d at 48 (citing <u>Hoffman-La Roche, Inc. v. Campbell</u>, 512 So. 2d 725, 735 (Ala. 1987)) (internal quotations omitted). However, "the language used in the handbook must be specific enough to constitute an actual offer rather than a mere general statement of policy." <u>Id.</u> (internal quotations omitted). Again, Plaintiff has failed to point to any evidence of an employment contract. Accordingly, Infirmary

West was within its rights to terminate Plaintiff for any reason or no reason, and summary judgment is due to be **GRANTED** as to Plaintiff's breach of contract claim.

## F.  Defendant's Motion to Strike

Plaintiff's proposed expert, Teresa Lanier, provides detailed professional opinion in paragraphs 7-10 of her affidavit concerning procedures for the checking of residuals in tube feeding, as well as the responsibilities of day- and night-shift nurses.  (Doc. 93 at 2).  However, these opinions are not relevant to the issues at hand and are due to be excluded pursuant to Fed. R. Evid. 402.  While Ms. Lanier may be relying on her years of experience as a nurse in expressing her opinions as to certain procedures, the relevant inquiry in this case is not whether Plaintiff followed generally-accepted nursing practices.  This evidence merely serves to question the wisdom of Infirmary West's policies and actions, which is irrelevant to Title VII claims.  See Alvarez, 610 F.3d at 1266.

In paragraphs 11 – 13 of her affidavit, Lanier expresses opinions on the administration of COBRA and FMLA.  (Doc. 93 at 3).  Lanier has presented no knowledge, skill, experience, training, or education that would qualify her as an expert to present opinion evidence on how these laws should be interpreted and administered.  See Fed. R. Evid. 702.

For the foregoing reasons, Infirmary West's Motion to Strike Plaintiff's "Expect Testimony" is hereby **GRANTED**.

**IV.     Conclusion**

For the reasons set forth herein, the Court finds that there are no genuine issues of material fact, that summary judgment is **GRANTED** in favor of the Defendant on all claims, and that this case is dismissed with prejudice.  The Court also **GRANTS** the Defendant's Motion to Strike.

Done this the 15th day of February, 2011.

**/s/ Kristi K. DuBose**
**KRISTI K. DUBOSE**
**UNITED STATES DISTRICT JUDGE**
